UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>v. )<br><br>CARLOS ACOSTA ESTRELLA and )<br>ANA ACOSTA GRAJEDA, *also known as*, )<br>ANA GUADALUPE ACOSTA GRAJEDA )<br><br>Defendants. ) | Criminal No. 19-10395-LTS |

ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS (DOC. NOS. 55, 57, 62, 64)

March 15, 2021

SOROKIN, J.

Defendants Carlos Acosta Estrella and Ana Acosta Grajeda were indicted by a grand jury

on October 16, 2019 for possession with intent to distribute 500 grams or more of cocaine in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2. Doc. No. 13.[1] Estrella

was also indicted for possession with intent to distribute 400 grams or more of fentanyl, in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi), and possession of a firearm in furtherance

of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). Id. In separately filed

motions, the defendants have moved to suppress various observations made by police officers

during a warrantless search of their apartment, Doc. Nos. 55, 64, and to suppress illegal drugs, a

firearm, and various incriminating documents later seized from that apartment pursuant to a

search warrant, Doc. Nos. 57, 62. The government has opposed. Doc. No. 71. For the reasons

which follow, the defendants' motions to suppress (Doc. Nos. 55, 57, 62, 64) are DENIED.

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing
system; pincites are to the page numbers in the ECF header.

1

I.      BACKGROUND

The following facts are drawn from the parties' submissions, the exhibits introduced into evidence at the evidentiary hearing held on March 10, 2021, and the testimony offered at that same hearing by Task Force Officer Shawn Cayer of the Drug Enforcement Administration (DEA) and Officer Richard Slamin of the Boston Police Department. Sometime in September 2019, federal agents received a tip from a confidential source that a drug supplier in Boston had four kilograms of cocaine for sale. Doc. No. 71-1 ¶ 13. At the direction of DEA agents, a cooperating witness ("CW") placed a call to the supplier and ordered four kilograms of cocaine. Id. The unidentified man who answered the call directed the CW to meet him at the D'Parma Restaurant at 182 Sumner Street in East Boston. Id. Federal agents and supporting officers from local police agencies travelled to the area to establish surveillance.

The CW drove to the meeting location, parked their car down the street, and waited for their contact inside the restaurant. Id. ¶ 15. [2] From their vantage point, several agents observed a man and a woman (later identified as Estrella and Grajeda) standing on the sidewalk outside the restaurant while the CW waited inside. Id. Grajeda was observed to be carrying a blue backpack. Id. Officer Slamin, a member of the Boston Police Department aiding in the DEA's investigation, was stationed down the street from the restaurant and was not able to see either the CW or the defendants during this period. Slamin was, however, able to observe the CW's vehicle, which was parked nearby.

For unknown reasons, the defendants remained outside the restaurant and did not approach the CW. After waiting for roughly twenty minutes, the CW left the restaurant and called their contact to ask if the meeting was still on. After some amount of time and phone calls,

_____

[2] Most of the movements described herein were video recorded by aerial surveillance.

the CW spoke with the contact and confirmed the meeting location. The CW met the defendants

on the sidewalk outside the restaurant. The CW and the two defendants then walked to the CW's

vehicle where they discussed the impending drug deal, in view (but not earshot) of Officer

Slamin. Id.

The following transaction in the CW's vehicle was audio and video recorded. Estrella

told the CW that he only had two kilograms of cocaine to sell. Id. ¶ 16. The CW complained that

this was less than promised but ultimately agreed to proceed. Id. Grajeda reached into her blue

backpack and gave the CW two kilograms of cocaine. Id. The CW, in turn, gave Grajeda

approximately $60,000 in sham DEA currency which was placed into the blue backpack. Id.

Once the defendants left the CW's vehicle, the CW called their DEA handler to confirm that the

transaction been completed and that they were in possession of two kilograms of cocaine. Id.[3]

Because of a technological malfunction, this message was not immediately transmitted to the

agents.

After reviewing word from the CW, agents began to move in to arrest the defendants.

The defendants, meanwhile, had left the CW's car unhurriedly, walked at a normal pace to a

nearby crosswalk, waited for several cars to proceed through the crosswalk, and then crossed

Summer street, putting them a brief distance from the door to 192 Summer Street. At this point,

the defendants were lost from the view of the surveillance teams. Not long thereafter, ten to

twelve agents descended on the area of 192 Summer Street and initiated a search for the

defendants, checking in restaurants and local businesses in the vicinity of where the defendants

were last seen. Officer Slamin was one of these agents. His search led him to the front door of

---

[3] The defendants do not dispute that probable cause existed to arrest them on the basis of this transaction. The Court therefore only briefly summarizes the pertinent facts.

192 Sumner Street. After opening the street-level door, Slamin proceeded up a staircase to a landing outside several residential apartments. There Slamin heard the sound of a crying child but found only closed doors. As he was walking back down the stairs, he heard the sound of a door closing, turned around, and observed Estrella leaving an apartment. Slamin spoke to Estrella and said words to the effect of, "Hold up a second, I want to talk to you." Another officer behind Slamin then shouted, "There he is!" Estrella turned and fled into the nearby apartment, bolting the door behind him. Slamin and other officers pursued Estrella to the apartment door and attempted to breach the door. On their third try they succeeded.

As this was occurring, another group of officers had rounded the back of 192 Sumner Street where they saw Estrella attempting to escape using the apartment's back door, which opens onto a fire escape. Id. 18. Estrella saw these officers and retreated back into the apartment. Id. The officers converged on the back door of the apartment and made entry into the apartment. As Estrella retreated back into the apartment, the agents at the front door were able to secure entry and swiftly took Estrella into custody. The agents at the back door gained entry as Estrella was being secured. The agents on the scene then took Grajeda into custody and performed a protective sweep of the apartment, during which they observed what appeared to be the sham DEA currency lying on the kitchen table. Id. An agent called the number used by the CW to set up the drug transaction, causing a phone on Estrella's person to ring. Id.

Thereafter, the United States District Court for the District of Massachusetts issued a warrant to search the apartment. Doc. No. 58-1. Pursuant to that warrant, agents seized one kilogram of heroin, a one kilogram of a mixture of cocaine and fentanyl, the sham DEA currency, a drug ledger, six cellular telephones, fraudulent documents in Estrella's name, and a shotgun and ammunition. Doc. No. 71 at 6.

In nearly identically worded motions, Estrella and Grajeda have move to suppress as evidence the observations made by officers during the initial warrantless entry into their apartment, Doc. Nos. 55, 64, and to suppress any and all evidence seized from their apartment pursuant to the later-issued search warrant, Doc. Nos. 57, 62.

II.     DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO A WARRANTLESS SEARCH AND SEIZURE (DOC. NOS. 55, 64)

The Fourth Amendment protects the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. To enforce this right, courts must exclude any evidence obtained as a direct result of an illegal search, as well as any evidence that is "derivative of" a Fourth Amendment violation—"the so-called 'fruit of the poisonous tree doctrine.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). For this reason, "[a] warrantless search involving an intrusion into someone's home is presumptively unreasonable." United States v. Beaudoin, 362 F.3d 60, 65 (1st Cir. 2004), vacated on other grounds sub nom. Champagne v. United States, 543 U.S. 1102 (2005). Nonetheless, a warrantless entry will be upheld in "exigent circumstances" where law enforcement officers confront a "compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Wilson, 36 F.3d 205, 209 (1st Cir. 1994) (quoting United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980)). "There are generally four types of exigent circumstances: (1) hot pursuit of a fleeing felon into a residence; (2) imminent destruction of evidence within a residence; (3) a threatened and potentially successful escape by a suspect from

inside the residence, or; (4) an imminent threat to the life or safety of the members of the public, the police officers, or a person located within the residence." United States v. Pena, 924 F. Supp. 1239, 1249 (D. Mass. 1996) (citation and internal quotation marks omitted).

Courts have "consistently recognized" that the exigent circumstances exception to the warrant requirement "encompasses the 'hot pursuit' of a suspect the police reasonably believe to be a felon." United States v. Soto–Beníquez, 356 F.3d 1, 36 (1st Cir. 2003) (citing Minnesota v. Olson, 495 U.S. 91, 100 (1990)); see also 2 John Wesley Hall, Search and Seizure § 22.27, at 35 (3d ed. 2000) ("Hot pursuit is the oldest recognized justification for a warrantless entry to search for and arrest a suspect."). Under this line of cases, "an officer who is looking for a fleeing suspect and has a reasoned basis to think that he has found the suspect is justified in pursuing the suspect into a house [without a warrant]." Soto–Beníquez, 356 F.3d at 36; accord United States v. Santana, 427 U.S. 38, 42 (1976) (holding suspected felon's "act of retreating into her house [could not] thwart an otherwise proper arrest").

Officer Slamin was in "hot pursuit" of Estrella when he gained access to Estrella's apartment through the front door. "'[H]ot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about [the] public streets.'" Santana, 427 U.S. at 42–43 (second alteration in original) (citation omitted). Here, the pursuit began as soon as agents received confirmation of the sale and moved in to arrest the defendants. Doc. No. 70-1 ¶ 16. This careful chase then turned into hot pursuit when Estrella was confronted by officers in his stairwell and fled for his apartment, with Officer Slamin close behind. Id. ¶ 17. There can be little doubt the

resulting warrantless entry "falls squarely within the doctrinal confines of the hot pursuit exception." Soto–Beníquez, 356 F.3d at 36.[4]

The defendants disagree, arguing there can be no "hot pursuit" absent the "immediate or continuous pursuit of the [defendant] from the scene of a crime.'" Doc. No. 56 at 6 (alteration in original) (quoting Welsh v. Wisconsin, 466 U.S. 740, 753 (1984)). But the "hot pursuit" doctrine applies regardless of whether a pursuing police officer was personally present at the commission of a crime. See Soto–Beníquez, 356 F.3d at 36 (explaining the doctrine applies whenever an "officer who is looking for a fleeing suspect . . . has a reasoned basis to think that he has found the suspect"). In Santana, for example, the warrantless arrest of a defendant inside their home was upheld, even though none of the arresting officers had personally witnessed the defendant commit a crime. See Santana, 427 U.S. at 40–43. And in any event, the facts of this case foreclose defendants' argument as Slamin was "on the scene" of the illegal transaction and had a clear view of the vehicle in which the deal took place.

Next, defendants argue that the doctrine of hot pursuit only applies when the subject of pursuit knows of the hunt and takes flight. But even granting the defendants this premise, the factual record establishes the reasonable inference that Estrella knew police officers were attempting to arrest him when he turned and fled into his apartment. Estrella had just completed a two kilo, sixty-thousand-dollar drug transaction with a man he had never met before. Immediately after the transaction, he discovered some number of men in his stairwell who

---

[4] In briefing and at argument, the parties focused on whether Officer Slamin's warrantless entry into the apartment was lawful. The Court notes, however, that there were in fact two warrantless entries. As Officer Slamin was breaching the front door, Estrella attempted to flee from the rear fire escape, where he encountered Agent Cayer, who then pursued Estrella back into the apartment through the apartment's rear door. Although these two entries occurred near simultaneously, it is apparent Slamin was the first to enter the apartment. But the precise timing of each entry is immaterial as it is apparent that both were authorized by exigent circumstances.

seemed to recognize him. The closest man to Estrella was wearing a police officer badge around his neck. The officers began moving towards Estrella and one shouted, "There he is!" At this point, Estrella bolted for his apartment, locked the door, and attempted to flee out the fire escape. From these facts, the Court finds that Estrella knew that the men pursuing him were police officers and that they intended to arrest him.[5] His flight and the resulting pursuit therefore fall comfortably within the "hot pursuit" doctrine.

Finally, defendants touch on an unsettled point of law in arguing hot pursuit only qualifies as a true exigency "if there is a realistic expectation that any delay would result in destruction of evidence." Doc. No. 56 at 6. The Government responds that "hot pursuit" is a stand-alone category of exigency justifying warrantless entry and highlights that the First Circuit has described the hot pursuit exception broadly, in language suggesting it applies even in the absence of any other exigent circumstances, such as a threat of danger or a risk that evidence might be destroyed. See, e.g., Soto–Beníquez, 356 F.3d at 36 ("[A]n officer who is looking for a fleeing suspect and has a reasoned basis to think that he has found the suspect is justified in pursuing the suspect into a house [without a warrant]."). But First Circuit has never confronted a case whose facts squarely present the question of whether hot pursuit, standing alone, will justify a warrantless search. See Soto–Beníquez, 356 F.3d at 35 (officers reasonably believed suspect was armed); United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993) (same). And at least one judge in this district has consequently questioned whether hot pursuit is truly an independent

---

[5] Defendants also argued at the evidentiary hearing that Slamin's pursuit of Estrella from the stairwell to his apartment does not qualify as "hot pursuit" because Estrella was not first "seized" by Slamin while on the landing prior to his flight. But the hot pursuit doctrine is not limited only to those suspected felons who escape arrest, the doctrine applies equally to those who avoid arrest in the first instance. See, e.g., Santana, 427 U.S. at 40–43 (holding hot pursuit doctrine applicable where suspect ducked into her house before police reached her, requiring pursuit into the home).

exception to the warrant requirement or, instead, one which must be buttressed by other exigent circumstances. See Stoddard v. Somers, No. Civ.A.03–10461–DPW, 2004 WL 2830704, at *6 (D. Mass. Dec. 4, 2004). The Court need not resolve this question here, however, given that any delay on the part of the officers in this case would have created a significant risk that evidence would be destroyed.

"[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." Kentucky v. King, 563 U.S. 452, 460 (2011) (internal quotation marks omitted) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)); see also Santana, 428 U.S. at 43 (upholding warrantless search when exigency of hot pursuit was coupled with risk that evidence would be destroyed). Estrella arranged to sell a large quantity of drugs at 182 Sumner Street in close proximity to the apartment at 192 Sumner Street, to which he went immediately after the sale was complete, creating the reasonable inference that Estrella used the apartment as a "stash house" to store drugs or other incriminating evidence. See, e.g., United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015) (finding "ample probable cause to believe" defendant kept drug-related materials at apartment based on observations of him leaving from and returning to apartment before and after controlled buys). Waiting on a warrant would have put this evidence at risk of destruction. See King, 563 U.S. at 461 (noting evidence in drug cases may be "easily destroyed by flushing [it] down a toilet or rinsing [it] down a drain"). What's more, the police knew the defendants had incriminating sham DEA currency in their possession, which was also potentially subject to destruction had the officers waited. See United States v. Miller, 680 F. App'x 187, 189 (4th Cir. 2017) (holding warrantless search justified when police had objectively reasonable fear incriminating counterfeit currency might be destroyed).

Under these circumstances, the Constitution authorized the officers to invade the defendants' home without a warrant.[6] The defendants do not challenge the scope or the manner of the search, limiting their arguments to the warrantless entry itself. Having concluded that the entry was justified, the Court DENIES the defendants' motions to suppress evidence obtained pursuant to a warrantless search and seizure (Doc. Nos. 55, 64).

III.   DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO AN UNLAWFUL SEARCH WARRANT (DOC. NOS. 57, 62)

"The Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause.'" United States v. Barbosa, 896 F.3d 60, 67 (1st Cir. 2018) (quoting U.S. Const. amend. IV). To satisfy this requirement, a "warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). In determining the sufficiency of an affidavit supporting a search warrant, a court will consider whether the "totality of the circumstances stated in the affidavit demonstrate probable cause to search the premises." United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003) (citing United States v. Khounsavanh, 113 F.3d 279, 282 (1st Cir.1997)). A court must examine the affidavit "in a practical, common-sense fashion and accord considerable deference to reasonable inferences the [issuing judicial officer] may have drawn from the attested facts." Strother, 318 F.3d at 67 (citing United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)).

---

[6] The facts of this case are far afield of those of Olson and Adams, upon which the defendants rely. In Olson, the warrantless entry was not proceeded by any pursuit, nor was there any reason to believe evidence might be destroyed had the police failed to act precipitously. See Minnesota v. Olson, 495 U.S. 91, 100–01 (1990). The same is true of Adams, in which the Court expressly noted that its holding was not based on hot pursuit or the need to prevent the destruction of evidence. See United States v. Adams, 621 F.2d 41, 45 (1st Cir. 1980).

The defendants claim the warrant authorizing the seizure of various incriminating items of evidence from their apartment was issued unlawfully. They do not challenge the sufficiency of the allegations supporting the "commission" element. Rather, they argue the warrant application did not establish probable cause to believe evidence of their alleged crimes would be found in their apartment.

The warrant application sets out several allegations directly connecting the defendants' alleged offenses to their apartment. Estrella arranged to sell a sizable quantity of cocaine in close proximity to the apartment. Doc. No. 71-1 ¶ 13. The defendants then returned to their apartment after completing the sale. Id. ¶ 17. And when the agents entered this apartment, they observed the proceeds from this sale sitting on the kitchen table. Id. ¶ 18.[7] Together, these allegations suggest the defendants used the apartment for drug trafficking. What's more, these allegations distinguish this case from one such as United States v. Roman, 942 F.3d 43 (1st Cir. 2019), in which suppression was warranted, in part, due to the lack of any direct evidence tying the defendant's alleged crimes to the location to be searched. See id. at 50–51.

Other allegations in the warrant application further support the view that inculpatory evidence would be found in the defendants' apartment. The large quantity of drugs the defendants had readily to hand suggests they were in the business of drug trafficking and that they would be in possession of incriminating records documenting their activities. See Feliz, 182 F.3d at 87 (noting it can "reasonably be supposed that a regular trafficker" will possess documents "showing the names and telephone numbers of customers and suppliers"). Given the

---

[7] Even had the Court concluded this observation ought to be excluded, it still would be reasonable to infer from the sequence of events detailed in the application that the defendants had returned to their apartment carrying the sham DEA currency.

evidence linking the defendants' alleged crimes to the apartment, it would be reasonable to suspect that these documents would be found upon a search of the premises. See id. at 88.

There was also cause to believe that a search of the defendants' apartment would reveal a significant quantity of illegal drugs. In his initial call with the CW, Estrella agreed to provide four kilograms of cocaine. Doc. No. 71-1 ¶ 13. But upon arriving at the meeting point, Estrella represented that he could only sell the CW two kilograms of cocaine. Id. ¶ 16. True, one plausible inference is that Estrella had miscalculated the quantity of drugs in his possession, suggesting no further drugs would be found in the apartment. But an equally plausible inference is that Estrella had decided to sell several kilograms of cocaine to another buyer, in which case a large quantity of contraband might still be found in his apartment.

The ultimate question is "whether facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found" in the place to be searched. Feliz, 182 F.3d at 87. "There is no requirement that the belief be shown to be necessarily correct or more likely true than false." Id. After careful review, the Court concludes the warrant application established probable cause to believe that evidence of the defendants' alleged offenses would be found upon a search of the apartment. The search warrant was adequately supported by the warrant application and therefore lawful.

Even if the warrant were not lawful, the Court would still deny the defendants' motions to suppress under the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984). Although evidence obtained in violation of the Fourth Amendment must usually be suppressed, the "good faith exception" excuses evidence secured under the authority of a search warrant which is later found to be invalid, when law enforcement's reliance on that warrant was objectively reasonable. See Leon, 468 U.S. at 922. Here, the agents' reliance on the search

warrant was objectively reasonable because the warrant application contained detailed allegations suggesting a close nexus between the defendants' criminal activities and their apartment. See supra. The defendants have not suggested the warrant application contained material omissions or misrepresentations. Neither the warrantless entry nor the probable cause determination were so close or so unusual as to put the officers on notice that they could not rely on the Magistrate Judge's probable cause determination. Under these circumstances, the Court would excuse any deficiencies in the warrant application, if indeed such deficiencies existed, under the authority of Leon.

The defendants' motions to suppress evidence obtained pursuant to an unlawful search warrant (Doc. Nos. 57, 62) are DENIED.

IV.   CONCLUSION

For the foregoing reasons, the Court DENIES the defendants' motions to suppress (Doc. Nos. 55, 57, 62, 64). The Clerk shall schedule an initial pretrial conference for March 25, 2021 at 10:00 a.m. The Court hereby ORDERS that the period from the filing of Defendant Estrella's motions to suppress, October 8, 2020, through to and including today's date, March 15, 20201, be excluded from the Speedy Trial Act computation of the time within which trial in the case must begin, pursuant to 18 U.S.C. § 3161(h)(1)(D).[8] The Court further ORDERS that the period from today's date through to and including the date of the initial pretrial conference, March 25, 2021, be excluded from the Speedy Trial Act computation pursuant to 18 U.S.C. §

---

[8] With the permission of the Court, Defendant Grajeda filed her motions to suppress after the deadline established by Magistrate Judge Boal. See Doc. Nos. 52, 66. To the extent the period attributable to this delay is not excludable pursuant to 18 U.S.C. § 3161(h)(1)(D) as to Defendant Grajeda, the Court orders it excluded from the Speedy Trial Act computation pursuant to 18 U.S.C. § 3161(h)(7)(B)(iv) for the purposes of investigation and preparation, as the ends of justice served by allowing the delay outweigh the interest of the public and the defendants in a trial within seventy days of the defendants' initial appearance.

3161(h)(7)(B)(iv) for the purposes of investigation and preparation, as the ends of justice served by allowing this delay outweigh the interest of the public and the defendants in a trial within seventy days of the defendants' initial appearance.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge