UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 19-10395-LTS |
| ) | |
| CARLOS ACOSTA ESTRELLA, ) | |
|     Defendant ) | |

GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through Assistant United States Attorneys Christopher Pohl and Alathea E. Porter, respectfully submit this trial brief in advance of trial, presently scheduled for September 6, 2022.

I.    The Superseding Indictment

Carlos ACOSTA ESTRELLA (hereinafter, "ESTRELLA" or the "Defendant") is charged in a superseding indictment with possession with intent to distribute 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii) (Count One), possession with intent to distribute 100 grams or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(i) (Count Two), and possession of a firearm in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c)(1)(A) (Count Three). See Docket No. 124.

II.    Summary Of The Government's Case

The Two-Kilo Deal. On September 9, 2019, Houston-based agents with the Drug Enforcement Administration ("DEA") shared information with their counterparts in Boston. A Houston confidential source had been contacted by a Mexican drug supplier who advised he had four kilograms of cocaine in Boston to sell for $29,500 per kilogram. The Mexican supplier

provided the Houston confidential source with a telephone number for the Boston cocaine source and that number was passed through Houston to agents in Boston.

On September 11, 2019, at approximately 11:00 a.m., DEA Boston directed a cooperating witness (CW-1) to place a recorded call to the telephone number, spoke to the Boston cocaine source, and ordered the four kilograms of cocaine.  The cocaine source directed CW-1 to meet him at the D'Parma Restaurant at 182 Sumner Street in East Boston.  At the restaurant, CW-1 was met by ESTRELLA (agents later confirmed that his was the male voice who spoke with CW-1 on the phone) and his mother, Ana Acosta Grajeda.[1]  ESTRELLA and Grajeda had with them a dark blue drawstring-type backpack embossed with an American flag. ESTRELLA, Grajeda, and CW-1 walked over to CW-1's car. During the recorded meeting, ESTRELLA changed the terms of the deal from four kilograms of cocaine to two kilograms:[2]

    ESTRELLA:  Look. Come look.

    GREJEDA:    That you should go look back there.

GREJEDA entered CW-1's car and sat in the back seat. ESTRELLA and CW-1 conversed behind the car with back door open.

    CW-1:        Yes, they don't have . . .

    ESTRELLA:  Right, right.

    CW-1:        The money is there. I had something for you to take the whole thing, complete, you know. So . . .

    ESTRELLA:  Do you know if [unintelligible]?

---

[1] On September 223, 2021, Grajeda pleaded guilty to possession with intent to distribute 500 grams or more of cocaine. On June 30, 2022, Grajada was sentenced to 60 months in prison and four years of supervised release (Docket Nos. 116 & 169).

[2] This draft transcript was prepared by Deborah Huacuja, a certified Spanish interpreter, and reviewed by CW-1. The government will continue to review the recording and draft transcript and will advise the Court and the defendant of any additional changes to the transcript.

CW-1: No, no, my friend. Truly, no. Because I really thought there were four. There are two.

ESTRELLA: Yes. Do you want me to call?

CW-1: No, no, the thing is not right. No, no, no, I'll talk to him. I hardly ever mess with those things, you know.

CW-1 walked away a short distance away from the car and called agents, who directed CW-1 to go through with the two kilogram deal. CW-1 returned to the car and sat in the driver's seat.

GREJEDA: Okay, get in.

ESTRELLA: Hand me the backpack, ma.

ESTRELLA entered the front passenger seat and shut the door.

CW-1: I'll put the pair in the backpack I have in the back there, all right?

ESTRELLA: Yes.

CW-1: There's no problem if I put it there. There's a backpack there. And if there's extra, you work it out with Indio, I don't care. Perfect. It's fine. Because I have . . .

ESTRELLA: No, no. One . . . two.

CW-1: I'm going to get the backpack. I'll put the money in the backpack for you. Take it, madrecita [little mama]. There's the money. We need to talk to Indio.

GREJEDA: Shall we switch it?

ESTRELLA: No.

CW-1: [unintelligible]. There's the money. There's the money, did you see it there? Make sure it's all there. You count it and I'll talk with the guy. The money can't be counted here. You count it, you know. I'll find you because I'm leaving with that there. One can't count that money over here.

ESTRELLA: Yes, yes, I know, I know. Okay, so where shall I leave the appliances[3] for you?

CW-1: Right there.

ESTRELLA: Alright.

CW-1: Leave it right there. Leave it there. Okay.

ESTRELLA: Let me just call to tell him that I am going to count it there at the . . .

CW-1: Yes because one can't count that money here. You told me there were four.

ESTRELLA: So how do you know those are sixty (60)?

CW-1: There are sixty, yes.

ESTRELLA: Because they come from . . .

CW-1: Yes, because they come from . . . there's a package there that has about two thousand there. You know, that's it.

ESTRELLA: Uh-huh. Yes.

CW-1: That package has two thousand, the one you have there.

GREJEDA: [unintelligible]?

CW-1: [unintelligible]. Just in case, if there's any money missing . . . If there's more, you call so that I can speak to him.

ESTRELLA: Oh, okay.

The video recording then captured ESTRELLA as he called an associate over his cell phone:

> This guy here is telling me that this car doesn't have tinted windows, uh, and there's a lot of activity and he has to leave. So, I am seeing that there are three packages with twenty each. He says that if anything comes up, to let him know and whether I have a place to count. That I should count the money right now, quickly and to let him know that everything is fine.

CW-1: I'll stay around here.

---

[3] The government expects to elicit lay opinion testimony from one of its law enforcement witnesses that "appliances" is slang for narcotics. See Section IV, infra (lay opinion evidence).

ESTRELLA continued to speak on his cell phone:

> He says he'll stick around here until I confirm, you know. That he'll ride around . . . Yes, because there's a lot of activity around here and the car isn't tinted . . . Right, that he should wait, I'll finish up here.

ESTRELLA then spoke to CW-1:

> So, just give me ten minutes and I'll go count it at the apartment.

CW-1: I'll stay here.

ESTRELLA: So, go for a ride.

CW-1: So, take it easy, buddy. I'll be waiting right here. I'll wait for you.

ESTRELLA: All right.

CW-1: All set, bye.

The video recording device in CW-1's car captured ESTRELLA and Grajeda as they entered CW-1's car, pulled two kilograms of cocaine from the blue American flag backpack and provided them to CW-1, retrieved $60,000 in sham DEA currency from CW-1, placed the money into the same backpack, and left.

<u>The Arrest and Search</u>. In addition to the video recording device, CW-1 was equipped with a transmitter to allow agents to listen in real time to the deal. The reception from the transmitter was spotty and agents did not know that the deal was done until CW-1 left Sumner Street and called them. In that time, ESTRELLA and Grajeda had walked away from the location where the deal occurred. Once CW-1 confirmed that the deal was complete, agents and officers moved in to arrest ESTRELLA and Grajeda. Aerial surveillance showed agents and officers surging toward Sumner Street looking for ESTRELLA and Grajeda.

A Boston Police officer, Richard Slamin, observed ESTRELLA on the second floor landing of 192 Sumner Street, an apartment building across from the D'Parma Restaurant and a short distance away from where the two-kilo deal occurred. When an officer asked ESTRELLA if he could speak with him, ESTRELLA ran and locked the door to the second floor apartment behind hm. Several agents eventually breached the front door while others entered the apartment through a back entrance accessed by the fire escape. Agents arrested ESTRELLA and Grajeda (ESTRELLA's wife was present in the apartment with children but agents eventually allowed them to leave). Agents obtained a warrant to search the residence for additional narcotics, documents, U.S. currency, and cellular telephones. Pursuant to the warrant, agents seized:

- approximately one kilogram of heroin,
- approximately one kilogram of cocaine,
- the $60,000 in sham DEA currency,
- the bag with the American Flag used by ESTRELLA and Grajeda to transport the two kilos of cocaine to the deal and the sham currency from the deal,
- a handwritten drug ledger,
- several cellular telephones, including the phone ESTRELLA used to set up the deal with CW-1,
- documents in ESTRELLA's name, including false identification documents, and
- a Kel Tec KS12 high-powered tactical shotgun with a laser sight and a box of shotgun shells.

III. Stipulations Of Fact

The parties have not yet discussed potential stipulations, however, the government anticipates proposing the following stipulations, which would obviate the need to call forensic chemists from the DEA Northeast Regional Laboratory to testify concerning the testing performed:

- That the drugs ESTRELLA and Grajeda delivered to CW-1 were 1.98 kilograms of cocaine, a Schedule II controlled substance, and

- That the drugs agents seized from 192 Summer Street, Apartment 2, were 994 grams of heroin, a Schedule I controlled substance, and 989.4 grams of cocaine, a Schedule II controlled substance.

IV.     Anticipated Evidentiary Issues

Admissibility of 404(b) Evidence. On February 10, 2022, the government provided notice to ESTRELLA of its intent to offer evidence pursuant to Fed. R. Evid. 404(b)(3).  See Docket No. 142, Government's Notice of Intent to Offer 404(b) Evidence (hereinafter, the "404(b) Notice"). Prior to taking any action concerning the Houston tip, DEA Boston ran the telephone number they had been provided through various law enforcement databases (a process commonly referred to as deconfliction). That search revealed no information about the Houston phone number and no ties to other investigations. Agents then directed CW-1 to contact the Houston number to set the cocaine deal described above in motion. Agents did not know who would show up to deliver the cocaine on September 11, 2019, and as was apparent from the aerial surveillance during and after the deal, agents did not where to find ESTRELLA or Grajeda after the deal concluded.

While the phone number for the "Boston cocaine source" had not come up before, two different law enforcement groups – a team of DEA agents based in New Bedford and agents with Homeland Security Investigations (HSI) – had already identified ESTRELLA as a representative of the Sinaloa Cartel living at 192 Sumner Street in East Boston. Beginning in 2018, the DEA New Bedford group identified ESTRELLA's home as 192 Sumner Street in East Boston and observed ESTRELLA routinely visit a stash house at 17 Avila Street in Hyde Park used by a drug crew whose members had engaged in several hand-to-hand fentanyl sales with a cooperating witness and undercover police officer.

On October 5, 2018, agents observed ESTRELLA and his wife park a Ford Taurus registered to ESTRELLA's wife in a garage in the Seaport District using a parking pass. The pass was associated with a telephone number subscribed to ESTRELLA's wife at 192 Sumner Street, Apartment 2, in East Boston. On November 5, 2018, agents observed the Ford Taurus arrive at 17 Avila Street and observed ESTRELLA and Adan Gabriel Lara-Ciprian, a/k/a "Bolivar Torres," who had engaged in hand-to-hand fentanyl sales with the CW and UC, carry items from the trunk into the stash house. On December 8, 2018, agents observed ESTRELLA, again in the Ford Taurus, meet Lara-Ciprian at 17 Avila Street and watched as they went inside the stash house. On April 2, 2019, ESTRELLA, his wife, and their minor children used the Ford Taurus to visit 17 Avila Street stash house. ESTRELLA entered the stash house with Willie Alexis Perez Baez, a/k/a "Richie," a co-conspirator of Lara-Ciprian's. On August 6, 2019 – a little over a month before ESTRELLA's arrest – agents observed ESTRELLA walk up to 17 Avila Street. ESTRELLA eventually greeted Lara-Ciprian at the front door to the stash house with a handshake and went inside. After an hour, ESTRELLA left the stash house, this time carrying a dark colored backpack with an American flag on it – just like the bag used to deliver the kilos and take the money on September 11, 2019.

On November 14, 2019 (two months after ESTRELLA's arrest), agents executed a search warrant at 17 Avila Street and seized hundreds of grams of fentanyl and cocaine, cutting agents, components for a kilo press, and several firearms. Thereafter, Lara-Ciprian, Perez Baez, and several other individuals were indicted for conspiracy to distribute 400 grams or more of fentanyl and other offenses. See United States v. Franklin Alcantara Lorenzo, a/k/a "Manuel Villalobos," et al., Cr. No. 19-10439-IT.

In addition to the DEA New Bedford case, agents with HSI were conducting a contemporaneous investigation into Mark Anthony Figueroa, a previously-convicted federal drug

trafficking defendant alleged to have laundered over $500,000 in cash intended to be sent to drug suppliers in Mexico. United States v. Mark Anthony Figueroa et al., Cr. No. 21-10333-RGS. In 2018-2019, agents determined that Figueroa was in contact with ESTRELLA and an indicted co-conspirator of Figueroa's. Agents also conducted surveillance that established that ESTRELLA lived at 192 Sumner Street and came and went from that address on a regular basis.

Federal Rule of Evidence 404(b) prohibits the admission of prior bad acts to establish an individual's character or propensity to commit a crime. The rule does permit, however, the admission of prior bad acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Bad acts committed subsequent to the charged behavior are admissible as long as they meet the criteria set forth in the Rule. See United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004).

DEA Boston did not know who the Boston cocaine source was until he showed up at the appointed hour at the D'Parma Restaurant and did not know the identity of ESTRELLA or any connection to 192 Sumner Street other than the man eventually identified as ESTRELLA ran inside the apartment and locked the front door to evade capture. The evidence proffered above is specially relevant in that it ties ESTRELLA to 192 Sumner Street for a year before his arrest. This evidence shows that ESTRELLA had the opportunity to store additional kilograms and the shotgun in the apartment and rebuts any innocent involvement defense. See United States v. Landry, 631 F.3d 597, 603 (1st Cir. 2011), citing Untied States v. Huels, 31 F.3d 467, 479 (7th Cir. 1994) (404(b) evidence admitted to show absence of mistake where defendant maintained he "wandered into the marijuana garden by chance" while hunting). ESTRELLA's connection to the 17 Avila Road drug crew shows that he had the requisite intent to possess narcotics with the intent to distribute them and to possess a firearm to protect himself, his drug stash, and drug proceeds. Landry, 631 F.3d at

603, citing United States v. Zackson, 12 F.3d 1178, 1182-83 (2d Cir. 1993) (admitting evidence of prior drug trafficking to show intent). See also United States v. Hicks, 575 F.3d 130, 141 (1st Cir. 2009) (introduction of three prior drug trafficking convictions relevant to prove defendant's knowledge of cocaine found in his home and his intent to distribute). The observations of ESTRELLA and evidence summarized above were all made or seized within a year before to two months after his arrest in this case. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008) (404(b) use of prior bank robberies proper when they occurred within fifteen months of the charged robbery).

Translations of Spanish Recordings. As noted above, the government has prepared English translations of the recordings between CW-1 and ESTRELLA and provided those translations to defense counsel (an additional transcript of a short phone call setting up the meeting will be produced as soon as it is completed). If necessary, the government will introduce evidence at trial concerning the authenticity of the recordings and the accuracy of the translations. In United States v. Rengifo, 789 F.2d 975 (1st Cir. 1986), the First Circuit Court of Appeals held that a properly authenticated transcript of a foreign-language recording may be admitted as substantive evidence and provided to the jurors during deliberations. Rengifo, 789 F.2d at 983. The First Circuit further held that the government's use of readers to read the transcripts, rather than play the recordings, "[does] not change the essential nature of the transcript evidence" and is therefore permissible. Id.

Lay Opinion Testimony. Fed. R. Evid. 701 governs opinion testimony by lay witnesses. Under the rule, a non-expert witness may testify in the form of opinion if the testimony is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

>    (c)   not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "[T]he touchstone for the admissibility under Rule 701 of such lay-opinion testimony is whether the testimony has the 'potential to help the jury'" and "is typically based on the lay expertise a witness personally acquires through experience, often on the job." United States v. Spencer, 873 F.3d 1, 14 (1st Cir. 2017) (internal quotation and citations omitted).

Courts regularly permit law enforcement witnesses to testify about various matters within their extensive experience as lay witness testimony under Rule 701. Such testimony often concerns the modus operandi of drug distribution. United States v. Moon, 802 F.3d 135, 147–48 (1st Cir. 2015) (permitting officer's testimony that drugs appeared to be heroin and crack cocaine and that drug dealers often possess firearms was properly admitted under Rule 701); Spencer, 873 F.3d at 13–14 (permitting officers' testimony that defendants' patterns of conduct and speech were, on the basis of their experience, believed to be typical of those working together as a team in selling drugs). Testimony by a law enforcement agent about the drug quantity signifying distribution as opposed to personal use, the tools of the drug trade, and transportation of drugs are all admissible as lay testimony. United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006) (holding that an officer's testimony that, based on his experience, certain post-it notes were likely drug orders and the number "4" likely referred to a quantity of drug found by law enforcement "did not cross the line to become expert testimony"). Agent testimony under Rule 701 is also admissible to explain coded language used by drug traffickers. See United States v. Belanger, 890 F.3d 13, 27–29 (1st Cir. 2018) (allowing testimony by a Special Agent in the Drug Enforcement Agency to help the jury understand drug slang in recorded phone calls); United States v. Dunston, 851 F.3d 91, 97 (1st Cir. 2017) (finding that the admission of a law enforcement officer's testimony "was comfortably

within the ambit of the district court's discretion" because the officer was "knowledgeable about the idiom of the drug trade and, in particular, the vernacular of this group of miscreants").

Here, the anticipated law enforcement testimony will demonstrate the common roles within drug trafficking organizations, the prices and weightage for different kinds of drugs, the methods by which drug traffickers collect drug proceeds, the means by which they move drug proceeds, and the tactical possession of a firearm on behalf of the drug trafficking operation. A typical juror is unlikely to be familiar with the practices of drug traffickers engaged in drug transactions. The proposed law enforcement testimony is necessary to provide the jury with a thorough understanding of the significance of the manner in which the drugs were distributed and the subsequent collection of payment for those drugs, the tactical protection of the drugs and how these facts relate to the practices of a drug trafficker.

V. Voir Dire Questions And Jury Instructions

At present, the government does not anticipate requesting any voir dire questions outside of those typically utilized by the Court in cases of this type. Also, the government does not anticipate requesting any jury instructions outside of First Circuit pattern instructions.

VI. Special Arrangements

The government respectfully requests that, in addition to trial counsel, the Court allow Eric McCarthy, a paralegal with the U.S. Attorney's Office, to sit at counsel table. Mr. McCarthy is an integral part of the prosecution team and will assist undersigned counsel in their efforts to introduce the physical evidence and audio/video recordings in this case.

VII.     Length of Trial

The government expects its case-in-chief to last approximately three-four days.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     /s/ Christopher Pohl
       Christopher Pohl
       Alathea E. Porter
       Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 15, 2022.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney