UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>　)<br>v.　)<br>　)<br>CARLOS ACOSTA-ESTRELLA )<br>　Defendant.　)<br>　) | CRIM. NO. 19-10395-LTS |

**DEFENDANT ACOSTA-ESTRELLA'S SENTENCING MEMORANDUM**

Since his arrest nearly four years ago, Carlos Acosta-Estrella has lived every day with a sense of impending precarity. Not simply because of the serious criminal charges which he faced, and for which he now faces a mandatory ten-year sentence, but because each day he has been incarcerated has been one where he has not been present to help his children, his wife, and his mother as they contended with a series of ongoing crises and challenges. The anxieties about his own risks have paled in comparison to what he has felt on his family's behalf. And, nearly as powerful, he also lives with the daily knowledge that his own actions are responsible for their hardship. That, but for his decision to become involved in a drug importation scheme, he would be able to lend a hand when it was most needed.

Mr. Acosta-Estrella is a devoted father. Having grown up without one, he sought to do for his family what his own father failed to do for him. Plainly, he made errors – he is ready to accept responsibility for those and he is extraordinarily reluctant to offer his children's medical conditions as any sort of justification for his actions. But it seems certain that – on some level – his children's needs played into his decisions. He is not a hardened criminal or lifelong drug-dealer. In Mexico, he worked for a car dealership. In Massachusetts, he spent the majority of his time working in food service. He was neither living in glamourous circumstances nor driving a flashy car when he was taken into custody. The amount of drugs involved in his crime, and the

1

presence of the firearm recovered from the scene speak to a more-than-casual level of involvement and so – it would stand to reason – there must have been an equally compelling motivation for Mr. Acosta-Estrella's actions.

Since his arrest, Mr. Acosta-Estrella has done what he can – under often trying and restrictive circumstances – to put himself on a better track. He learned English in jail, and distinguished himself as a worker while at Plymouth. He has kept in daily contact with his family and tried to remain a meaningful presence – if a remote one – in his children's lives. He comes before the court knowing that his best chance is a 10-year sentence, but he has made an earnest effort to give this Court good reason for finding that a sentence of 120 months imprisonment is "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2).

## PROCEDURAL AND FACTUAL BACKGROUND

On September 11th, 2019, the Defendant was arrested and detained on the instant offense. On September 6th, 2022, he pleaded guilty without a plea agreement to a superseding indictment charging Possession with Intent to Distribute 500 Grams or More of Cocaine[1], Possession with Intent to Distribute 100 Grams or More of Heroin[2], and Possession of a Firearm in Furtherance of a Drug Trafficking Offense[3]. PSR at ¶¶1-3.

## GUIDELINE SENTENCING RANGE

The Defendant agrees with Probation's calculation of the Guideline range: 70 to 87 months, based on an Offense Level of 27 and a Criminal History Category I but – due to the mandatory minimums (a minimum 60-months sentence for counts one and two, followed by a

---

[1] 21 USC §841(b)(1)(B).
[2] 21 USC §841(b)(1)(B).
[3] 18 USC §924(c)(1)(A).

consecutive minimum 60-month sentence for count three) – the minimum sentence is 120 months. PSR at ¶¶ 29, 60-62.

## ARGUMENT

### A. A 120-Month Sentence Satisfies the Goals of Sentencing Enumerated in 18 USC §3553.

Mr. Acosta-Estrella returned to the United States from Mexico, settling in Massachusetts in the hope of a better life. Despite having previously been deported, PSR at ¶41, he risked a return because America, he thought, held more opportunities for him, his family, and his children than what his home offered. Settling in East Boston, Mr. Acosta-Estrella tried to set down a secure, nine-to-five foundation for his family, finding an apartment and working a food service job. He had held honest employment in Mexico and had thrived at it, see *Exhibit A* (Letter of Eugenio Caire, June 20, 2023.) and hoped to establish the same sort of modest, dependable success here. Unfortunately, the opportunities he subsequently pursued brought him before this Court. He is now in the process of trying to course-correct, and to make the necessary changes so that – upon his release from prison, he can return to his family and his children as the provider and caregiver they need.

### a. A 120-Month Sentence is Sufficient and Not Greater Than Necessary In light of Mr. Acosta-Estrella's History and Characteristics and the Nature of the Offense.

Carlos Acosta-Estrella was born in November of 1988 in Sonora, Mexico. PSR at ¶39. Though he was ultimately raised in a safe home, it was only after being abandoned by his father, and [4]effectively abandoned by his mother. Id. Mr. Acosta-Estrella's mother, Ana Acosta-Grajeda, was 24 when Carlos was born, and ill-equipped to deal with raising a child on her own. Acosta-Estrella eventually formed a bond with his mother, and came to appreciate her reasons

---

[4] Mrs. Acosta-Grajeda was the co-defendant in this matter. She was previously sentenced and subsequently granted early compassionate release, after being diagnosed with cancer while in custody.

3

for leaving him in the care of his maternal grandmother, but his early life was colored by the absence of a father figure (he regarded his grandmother as both his mother and father, PSR at ¶39), the sense of frustration at having been discarded, and the concern that his circumstances made him a burden born by his extended family. While his eldest cousin, Graciela Munoz, recalled young Carlos as "behav[ing] honestly" while growing up in Sonora, she speculated that the nature of his childhood home may have contributed, ultimately, to his conduct in this case:

> Not to justify anything, I repeat, I understand the dimensions of the facts, [but] maybe the absence of parents and of clearer guidance, [and] feeling within a loneliness defined by his childhood (lack of parents and guidance, which was absent), he was not able to measure the error that he was making at that moment, of which he is today most regretful and aware that that's not how things are.
> *Exhibit B* (Letter of Graciela Munoz)

Most of his Mr. Acosta-Estrella's youth was spent in a lower middle-class residential neighborhood. Id. Unlike many defendants that come before this court, he was fortunate to have enjoyed a relatively stable childhood – his childhood was free of abuse and he was not raised in around substance abuse. Id. He attended school in Sonora, completing most of high school, but not graduating. PSR at ¶51. Despite not graduating, Mr. Acosta-Estrella attended some college level courses, and also received some on-the-job training when employed in Mexico. Id.

In 2008, in his early 20s, Mr. Acosta-Estrella began a long-term relationship with Maria Campoy Diaz. Id. at 42. They remain in a close relationship to this day – Mr. Acosta-Estrella refers to her as his wife – and speak regularly, often daily, despite Mr. Acosta-Estrella's incarceration. Id. at 43. After three years, the couple had their first son, Jesus Estrella Campoy. Id. at 42. The same year, unfortunately, Mr. Acosta-Estrella's grandmother died of cancer. Id. at 39. A new father, and no longer able to turn to his grandmother for advice, Mr. Acosta-Estrella began looking for the next step in his life. In 2013, he entered the United States on a tourist visa,

hoping to explore possibilities for emigrating and working. Unfortunately, he became caught up in an acquaintance's scheme to purchase consumer electronics and goods with fraudulent credit cards. Id. at 32. Arrested on a drug charge – he was found to be in possession of a small amount of cocaine by the officers who foiled the fraudulent purchase – Mr. Acosta-Estrella received a probationary sentence but was subsequently deported. Id. at ¶¶32, 41.

Returning to Sonora, Mr. Acosta-Estrella attempted to make a go of a stable life. He got a job working as a salesperson for a local Kia dealership, Id. at 56, *Ex. A*, and later moved to a Toyota dealership which recruited him based on his skill. Id. at 56. Mrs. Campoy recalls this time as illustrative of who Carlos really is: an ambitious hard-worker who is quick to acquire skills necessary to flourish. "Here in Mexico he always held honest [and] decent jobs, since he is an intelligent man, who learns fast," she writes noting that he has retained that train while incarcerated, "[S]pending these years in jail he has learned English 100%[,] and no longer needs an interpreter." *Exhibit C* (Letter of Maria Campoy).

Despite this success, Mr. Acosta-Estrella and Ms. Campoy soon faced serious challenges. Their second child, Carlos, was born in 2015, and [Medical Information] The costs associated with the treatment were not insubstantial, and – though his family assisted – were more than what Mr. Acosta-Estrella could afford with his dealership job. Faced with these pressures, Mr. Accosta-Estrella and Mrs.

5

Campoy decided to risk a return to the United States. The family first settled in Arizona, where Mr. Acosta-Estrella worked in restaurants and at the periphery of the local economy. Eventually, the family relocated to Massachusetts. Shortly thereafter, in 2019, their daughter, Isabella, was born. Again, medical complications soured what should have been a joyful occasion. Isabella ████ Medical Information ████

████████

While living in Massachusetts meant that Carlos and Isabella could rely somewhat on MassHealth, it was still not enough to defray the costs associated with the children's conditions. Though he'd been working in restaurants in the Boston area to make ends meet, Mr. Acosta-Estrella eventually became involved with contacts with individuals involved in drug trafficking who came from the same area in which he was raised. He does not deny that – by the time of his arrest – he had become considerably enmeshed in the group's drug importation operation.

Incarceration is difficult under any circumstances but is particularly hard when one is separated not just from family, but from family who are particularly vulnerable. That has been Mr. Acosta-Estrella's experience since September of 2019. As the letters of Mrs. Campoy and Jesus Estrella Campoy reflect, the expense and the effort of caring for Carlos and Isabella is overwhelming and effectively a full-time job, even with assistance from other family members. *Ex. C, Exhibit F* (Letter of Jesus Estrella Campoy). ████ Medical Information ████

████████

6

Medical Information

▇▇▇▇▇▇▇▇

The deleterious impact on innocent third parties, particularly small children is a critical consideration that has been frequently considered by courts in arriving at the appropriate sentence – understandably so, given the far-reaching implications. See e.g. *United States v. Jagemann*, 2007 WL 2325926 (E.D. Wis. Aug. 8, 2007) (finding that prison was not necessary to satisfy the purposes of punishment for a defendant convicted of possession with intent to distribute cocaine, in part, because "his family (including his ex- wife, to whom he paid alimony) depended on defendant, and a prison sentence would harm them without adding significantly to punishment or deterrence") (citing 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A) & (B)); *U.S. v. Galante*, 111 F.3d 1029 (2d Cir.1997) (affirms district court's 13-level downward departure in drug case from 46-57 months to eight days – where defendant showed he was a conscientious and caring father of two young sons who would have faced severe financial hardships). Whatever sentence this Court thinks justified for Mr. Acosta-Estrella, it can and should also consider the severe hardships faced by his family, to whom he is deeply bonded.

In the nearly four years since his arrest, Mr. Acosta-Estrella has reflected extensively on the costs his actions have imposed. Notably, while he could focus on the costs to him – the loss of freedom, the difficulty of being incarcerated during COVID, the anguish of being separated from his children and from his mother during her illness – he expresses his regret in terms of the hardships he has imposed on others. He is keenly aware of the difficulties Mrs. Campoy faces on a daily basis, and that his younger children are growing up without his presence in their lives – the same absence he contended with as a young man. PSR at ¶49. The sense of remorse he

carries for the actions that separated him from his children and his mother in their hours of need is palpable when speaking with him.

Nevertheless, he has not let incarceration dull his better characteristics. As Mrs. Campoy noted, he has become fluent in English during his time in jail. While at Plymouth County Correctional Facility, he sought out opportunities to work -eventually being assigned the job of helping prepare meals for other inmates with dietary restrictions (something he was familiar with, due to his son's condition) – and distinguished himself through his hard work. PSR at ¶49.[5] Since arriving at Wyatt, Mr. Acosta-Estrella began doing programming there – both in-person classes as well as coursework on his tablet – and he looks forward to taking coursework while in BOP custody.[6] *Exhibit G* (Programming Certificate from Donald W. Wyatt Detention Facility)

Further, Mr. Acosta-Estrella does not have serious substance use issues. While he does not deny previous drug and alcohol use, even conceding to drinking frequently prior to his arrest, he does not have a significant history indicating addiction. PSR at ¶50. He has demonstrated an ability to curtail substance use successfully, having overcome a reliance on sleep aids and anxiolytics shortly after being taken into custody. PSR at ¶47. His lack of any serious mental health, PSR at ¶48, or substance use issues suggest he is less likely to recidivate and will readjust to ordinary life more easily upon his eventual release. As he is not a person who requires mental or physical health treatment and has considerable experience working in retail, he does not need extensive vocational training, he does not require a lengthy sentence to ensure rehabilitation. Therefore, he asks the Court to sentence him to the mandatory minimum 120 months.

---

[5] Counsel spoke to Robin McGrory, Director of Programs at PCCF, who corroborated the information in ¶49 and stated that Mr. Acosta-Estrella is remembered by PCCF staff in a very favorable light for his work ethic and diligence. While, per PCCF policy, she cannot provide a written reference, she has offered to confirm this for the court via telephone.

[6] Mr. Acosta-Estrella hopes to take business training, and also learn barbering skills.

8

**b. The requested sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and appropriately protects the public.**

The 18 U.S.C §3553(a)(1)(A) factors reflective retributive concerns. Retribution refers to "just deserts", but justness and the usefulness of the "deserts" is often debatable. Retribution may have its place, but should not be elevated above other considerations, and to the detriment of the other three sentencing objectives. And the risk of that outcome often seems particularly acute in the context of mandatory-minimum offenses, where the a broad-strokes rule restricts a court's discretion to tailor a sentence where individual circumstances might otherwise temper the retributive aspect of a sentence.

"Retribution sits uncomfortably at the intersection of two aspects of our responses to harm: our desire for people to suffer and our desire for people to change [….] But there is another option [….] the issue is not just how we show our condemnation, but how we affirm unequivocally and powerfully the importance of what was violated, without destroying the person who violated it."[7] The laws that Mr. Acosta-Estrella violated are important, the broad harms created by drug and firearms offenses are serious and of concern to the general public, and Congress has reacted to and emphasized those concerns – so the theory goes – by specifying conditions where mandatory minimums will apply. Mr. Acosta-Estrella does not seek to diminish his responsibility for those harms, and fully recognizes that his role[8] allowed these harms to occur. Yet it is equally important to recognize that Mr. Acosta-Estrella has been and will continue to be sanctioned for this crime, and adding additional months to his sentence, beyond the mandatory 120 months, will do little to make the sentence a more just one. Mr. Acosta-

---

[7] Sered, Danielle, *Until We Reckon, Violence Mass Incarceration and the Road to Repair*. New York: The New Press, at 89-90.
[8] Mr. Acosta-Estrella does, however, continue to object that he is *not* a representative of the Sinaloa cartel.

Estrella is a man with an impressive work ethic. He can now use those things to do meaningful work and eventually hold his head high again as a contributing, positive member of his community in Mexico. A just sentence will punish his criminal conduct, but should also seek to preserve, rather than squander his good traits.

To determine what is "just punishment" for Mr. Acosta-Estrella under 18 U.S.C. § 3553(a), the Court must also consider how Acosta-Estrella will serve his prison time and the certainty of his deportation following incarceration. Mr. Acosta-Estrella is deportable under the Immigration and Nationality Act. See INA § 101(a)(43), 8 USC § 1101(a)(43), and chose not to contest deportation.[9] The First Circuit has held that "a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence." *Hercules*, 947 F.3d at 9. A defendant's potential deportation is relevant to several § 3553(a) factors. *Id*. First, "a defendant's potential deportation may properly be considered as part of a broader assessment of his history and characteristics pursuant to section 3553(a)(1)." *Id*. Second, "a defendant's potential deportation . . . may prove relevant to whether a sentence will adequately 'protect the public from further crimes of the defendant.'" *Id.*, quoting 18 U.S.C. § 3553(a)(2)(C). Third, "[f]uture threats to the community might conceivably be mitigated in a situation in which, upon release from imprisonment, the defendant will promptly be deported." *Hercules*, 947 F.3d at 9, citing *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006).

---

[9] In addition, as a non-citizen his aggravated felony convictions render him ineligible for various forms of relief from removal, he is subject to mandatory immigration detention and is ineligible for a bond hearing, warrant cancelation, and is barred from making an asylum claim, and he will be permanently barred from re-entering the United States. *See id.* § 1229b(a)(3) (cancellation of removal); id. § 1231(b)(3)(B)(ii) (withholding of removal); id. §1158(b)(2)(A)(ii), (B)(i) (asylum); 8 U.S.C. § 1182(a)(9)(A) (permanent bar on re-entry).

10

As a result of his immigration status, which the BOP treats as a public safety factor, Mr. Acosta-Estrella will face harsher and more restrictive terms of incarceration.[10] Following completion of his term of incarceration in the BOP, he will likely be further detained in an ICE facility, where he will remain until he is ultimately deported.[11] Further, any risk to citizens of the United States (had there be one) will be eliminated when he deported, making concerns regarding specific deterrence and incapacitation less relevant.

As the Court recognized in *Hercules*, the fact that he will likely be promptly deported also helps to address will advance the "protection of the public" concerns. *Id*; 18 U.S.C §3553(a)(1)(C). The Government will likely suggest that with this type of crime, that crosses borders, deportation will serve no incapacitation concerns. However, Mr. Acosta-Estrella's value in the international scheme was his presence in the United States. That value will be extinguished when he is deported. Perhaps more important to protecting the public is Mr. Acosta-Estrella's deepening understanding of the harm he has caused. Due to his role in this offense – effectively

---

[10] U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 5, at 9 (Sept. 4, 2019), available at https://www.bop.gov/policy/progstat/5100_008cn.pdf. This results in harsher and more restrictive terms of incarceration. *See* National Immigration Project, *Public Comment on Proposed Amendments re: Immigration Consequences, Cultural Assimilation, and Recency (75 Fed. Reg. 3525, Jan. 21, 2010)*, at 2-3 (Mar. 22, 2010), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20100317/National%20immigrationProject.pdf [hereafter "NIP Public Comment"]. "The physical reality of a higher security facility has serious detrimental [e]ffects on a prisoner's mental health[.]" *Id.* at 3. The National Immigration Project noted that these detrimental effects include, but are not limited to, an inability to obtain outside work assignments, restrictions on access to mail, limited ability to have contact visits with family members, and limited or no access to occupational and educational programs. *Id.* at 2-3.

[11] On completion of his sentence, Mr. Acosta-Estrella will be immediately transferred into ICE custody, pending his inevitable deportation. *See Bado v. United States*, 186 A.3d 1243, 1254 & n.22 (D.C. Cir. 2018) (individual who is not legal permanent resident convicted of aggravated felony subject to mandatory detention pending removal proceedings and during period between time order of removal is entered and when individual is actually removed) (*citing* 8 U.S.C. § 1231(a)(2)). Furthermore, while deportations to Mexico are common enough that a long delay is unlikely, it is nevertheless the case that ICE may detain Mr. Acosta-Estrella for six months or more should something unforeseen (e.g., a global pandemic) occur that interrupts the typical operation of deportations. *See Reid*, 17 F.4th at 4 (no per se constitutional entitlement to bond hearing after six months of ICE detention while awaiting deportation). *See also Alphonse v. Moniz*, No. 21-11844-FDS, 2022 WL 10480100, slip op. at 4-5 (D. Mass. Oct. 17, 2022) (detention under § 1226(c) for more than one year likely to be unreasonable; likely violation of due process rights where individual was detained pending deportation without bond hearing for nearly twenty-two months).

a warehouseman for substances, rather than a dealer – it was easy for Mr. Acosta-Estrella to distance himself from the humanity on the other end of the crimes. While of course he should have appreciated this through the impact of his crimes, he had not. He has now been confronted, through the evidence, conversations with counsel, and the government's filings the individual harms his transactions played a role in. That reality will do more to protect the public than warehousing him.

### c. A sentence longer than 120 months would do nothing to advance specific or general deterrence concerns, and in fact may subvert them.

The requested sentence sufficiently advances the need to afford adequate deterrence of criminal conduct when imposing a sentence pursuant to 18 U.S.C. § 3553(a). However, while system actors – courts, prosecutors, and even defense attorneys – continue to operate as if deterrence can be achieved through longer carceral sentences, researchers have concluded that long prison sentences afford little, if any, deterrent value.[12] For instance, a 2013 meta-analysis of studies on deterrence overwhelmingly concluded that "it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime-prevention basis."[13]

Rather, leading deterrence scholars for the past two centuries have overwhelmingly found that both specific and general deterrence is primarily a function of the *certainty of apprehension*, not the severity of the punishment.[14] Increasing prison term's length reduces recidivism by a

---

[12] *See* Martha Nelson et al., *A New Paradigm for Sentencing in the United States*, VERA INST. OF JUST. 23 (Feb. 2023), available at https://www.vera.org/downloads/publications/Vera-Sentencing-Report-2023.pdf; Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113, 121,123-124 (2018); NAT'L INST. OF JUST., *Five Things About Deterrence* 1-2 (May 2016), available at https://www.ojp.gov/pdffiles1/nij/247350.pdf; *Long Prison Terms*, JUST. POL'Y INST., https://justicepolicy.org/long-prison-terms/ (last visited Feb. 9, 2023).
[13] Id. at 23, citing Daniel S. Nagin, *Deterrence in the Twenty-First Century*, *in* 42 CRIME & JUST. 199, 202 (Michael Tonry, ed., 2013).
[14] *See* Nelson et al., *supra* note 12, at 23; Daniel Nagin, *Incarceration & Public Safety*, ARNOLD VENTURES 4-5 (July 2022), available at https://craftmediabucket.s3.amazonaws.com/uploads/AVCJIReport_IncarcarationPublicSafety_Nagin_v2.pdf; Maurice J.G. Bun et al., *Crime, Deterrence and Punishment Revisited*, 59 Empirical Econ. 2303, 2329 (2019).

negligible amount, if at all.[15] And while increasing a sentence length yields does little to improve deterrence related outcomes, longer sentences ratchet up the undesirable consequences associated with imprisonment; incapacitating an individual long past what is required by public safety, impose serious and avoidable financial and public health costs in the process, and potentially creating a greater long-run risk of reoffending.[16]

Particularly with regards to *specific deterrence*, research reveals that the experience of incarceration may produce a perverse outcome, increasing rather than decreasing recidivism.[17] Evidence of a specific deterrence effect is scant.[18] Instead, most studies find that incarceration has no effect on recidivism or instead, an aggravating criminogenic effect.[19] Imprisonment and overly punitive sentences can increase future offending for a host of reasons, including the associated stigma of a criminal record that complicates the process of reintegration and restricts access to housing and career opportunities, the atrophy of skills for effective functioning in legal labor markets while incarcerated, and the erosion of bonds during incarceration with non-criminally involved family, friends, and support networks.[20] The social experience of living

---

[15] *See* William Rhodes et al., *Relationship Between Prison Length of Stay and Recidivism: A Study Using Regression Discontinuity and Instrumental Variables with Multiple Break Points*, 17 Criminology & Pub. Pol'y 731, 733, 758 (2018); *Long Prison Terms*, *supra* note 1.
*See also* Susan Howley, *Reflections on Long Prison Sentences: Conversations with Crime Survivors, Formerly Incarcerated People, and Family Members*, COUNCIL ON CRIM. JUST.: TASK FORCE ON LONG SENTENCES 6 (Jan. 2023), available at https://assets.foleon.com/eu-west-2/uploads-7e3kk3/41697/reflections_on_long_prison_sentences_-_howley.4d54a984fb61.pdf.

[16] *See* Special Directive 20-08 from George Gascón, LA Dist. Att'y to All Deputy Dist. Att'ys 3 (Dec. 7, 2022), available at https://da.lacounty.gov/sites/default/files/pdf/special-directive-20-08.pdf; Nelson et al., *supra* note 12, at 28 ("Incarceration breeds disruption and makes communities less safe.").

[17] *See* Nagin, *supra* note 13, at 4.

[18] *Id. See generally* Daniel S. Nagin et al., *Imprisonment and Reoffending*, *in* 38 CRIME & JUST. 115 (Michael Tonry, ed., 2009); Charles Loeffler & Daniel S. Nagin, *The Impact of Incarceration on Recidivism*, *in* 5 ANN. REV. OF CRIMINOLOGY 133 (Tracey L. Meares & Robert J. Sampson, eds., 2022); Damon M. Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, *in* 50 CRIME & JUST. 353 (Michael Tonry, ed., 2021).

[19] Nagin, *supra* note 13, at 4. See Loeffler & Nagin, *supra* note 18, at 133 ("A smaller number of studies do, however, find significant effects, both positive and negative. The negative, recidivism-reducing effects are mostly in settings in which rehabilitative programming is emphasized and the positive, criminogenic effects are found in settings in which such programming is not emphasized.").

[20] Nagin, *supra* note 13, at 2; Jennifer E. Copp, *The Impact of Incarceration on the Risk of Violent Recidivism,* 103 Marq. L. Rev. 775, 780-781 (2020), available at

within a prison setting for an extended period of time can also amplify criminal tendencies of released offenders, and in turn, increase recidivism, insofar as individuals are perpetually surrounded by and affiliate with other inmates from whom they may acquire criminogenic attitudes, beliefs, or behaviors.[21]

This is not to suggest that the *prosecution and arrest* of Mr. Acosta-Estrella may not have some deterrent value; rather, it is simply that that work is now substantially done. Adding months to his sentence will yield little productive deterrent effect, may have a deleterious impact on specific deterrence concerns, and would expend unnecessary tax-payer resources.[22]

In further considering the issue of specific deterrence, Mr. Acosta-Estrella does not pose a cognizable risk of danger to the community or of recidivism. Upon completing his sentence, he will return to Mexico. It is not unreasonable to suggest that Mr. Acosta-Estrella's arrest and the subsequent years of confinement alone provided adequate specific deterrence from future offending. Simply stated, if the only concerns were only protection of the public and specific deterrence, prompt deportation alone – rather than several years of warehousing at the taxpayer's expense – would be the most appropriate sentence.

Regarding general deterrence, the threat of punishment may prevent crime by causing people to refrain from engaging in unlawful behavior out of fear of being punished.[23] Extending this concept of deterrence seems intuitive: the more dire the threatened punishment, the more

---

https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5440&context=mulr; Nelson et al., *supra* note 12, at 29 ("[C]ustodial sentences not only do not prevent reoffending, but they can also actually increase it… [T]he prison environment, separation from community, or even the process of returning to the community is so destabilizing that it increases the likelihood of continued encounters with the criminal legal system.").

[21] *See* Nelson et al., *supra* note 12, at 29; NAT'L INST. OF JUST., *supra* note 13, at 1; Rhodes et al., *supra* note 14, at 734 ("Other criminologists argue that prisons are schools for crime where inmates learn how to become more knowledgeable offenders. There is also ethno-graphic research with results showing how prisons reinforce cultural values conforming to criminal activity; that is, offenders import these values from their community, and deviant values are reinforced by the structure and organization of prison."); Copp, *supra* note 21, at 780.

[22] *See* Presentence Investigation Report, ¶194.

[23] Nagin, *supra* note 13, at 5.

effective it should be at discouraging people from committing crimes. Deterrence theory was part of the rationale for lengthening and increasing the surety of sentences to incarceration through the expansion of mandatory minimums in the 1980s and 1990s.[24]

Study after study, though, has shown that people do not order their unlawful behavior around the *harshness* of sentences they may face, but around their perceived likelihood of being caught and facing any sentence.[25] This theory originated over two centuries ago: "One of the greatest curbs on crime is not the cruelty of punishments, but their infallibility.... The certainty of punishment even if moderate will always make a stronger impression."[26] Contemporary research continues to support this principle – that certainty of detection matters over severity of sanction. This is due to several factors.  First, the general public's knowledge of, or even an individual's familiarity with, the specific criminal sanctions set by legislatures is often limited at best.[27] Second, most people are deterred from engaging in unlawful behavior not because they fear a particular sanction but simply because they know the behavior is prohibited.[28] Studies of the impact of increasing sentence severity generally find no evidence of a deterrent effect or, at most, a modest effect.[29] In contrast, literature analyzing the impact of increasing police numbers

---

[24] *See* Nelson et al., *supra* note 12, at 23. For example, in 1994, California Governor Pete Wilson said about the state's new three strikes law: "I'm convinced that if we are sending clear messages to career criminals, we will begin to see them reform their conduct." *See* Daniel Weintraub, '3 Strikes Law' Goes into Effect," L.A. TIMES (March 8, 1994), available at https://perma.cc/WU2F-EW6L. https://www.latimes.com/archives/la-xpm-1994-03-08-la-me-threestrikes-wilson-samuel-timeline-story.html.

[25] *See* Nelson et al., *supra* note 12, at 23; Nagin, *supra* note 14.

[26] Nagin, *supra* note 13, at 5.

[27] *See* Nelson et al., *supra* note 12, at 23; Michael Cholbi, *Harsh Justice: Why Doesn't Increasing the Severity of Punishment Lead to Less Crime?*, PSYCH. TODAY (Sept. 13, 2015), available at https://www.psychologytoday.com/us/blog/ethics-in-question/201509/harsh-justice.

[28] *See* Nelson et al., *supra* note 12, at 23; NAT'L INST. OF JUST., *supra* note 12.

[29] Nagin, *supra* note 13, at 5; *See generally* NAT'L RSCH. COUNCIL, THE GROWTH OF INCARCERATION IN THE UNITED STATES: EXPLORING CAUSES AND CONSEQUENCES (Jeremy Travis et al. eds., National Academies Press 2014), available at https://www.njjn.org/uploads/digital-library/Nat-Academies-Press_Growth-of-Incarceration-in-US_Oct-2014.pdf

or their strategic deployment, for example in areas experiencing high concentrations of criminalized behavior, consistently find a deterrent effect.[30]

Here, the work of deterring Mr. Acosta-Estrella, and others like him, has already been done. He was arrested in September of 2019 and has spent nearly four years in custody – years which -for obvious reason – have been more strenuous and psychologically depleting than might otherwise be the case. Mr. Acosta-Estrella's custody has spanned the large-scale health crisis of Covid 19 – which he contracted twice while in custody – as well as the private health issues of his children and his mother. Given those experiences, as well as the certain knowledge that he will be deported at the end of his sentence, it does not seem unreasonable to suggest that Mr. Acosta-Estrella has been sufficiently deterred, and anyone considering his life since 2019 might also regard him as an object lesson. A longer sentence will do absolutely nothing to advance larger deterrence concerns, and the costs associated with further incarceration will likely significantly outstrip any benefits, general or specific.

### d. A sentence longer than 120 months would not have any rehabilitative value.

Additionally, there is also no rehabilitative value for a sentence any longer than that proposed. 18 U.S.C §3553(a)(1)(D). Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Mr. Acosta-Estrella has no mental illness, nor long-term and serious substance use disorder history that requires treatment under supervision, and as a "deportable alien," he will not be eligible for placement in a residential re-entry center. *See* BOP Program Statement 7310.04 at 10. While Mr. Acosta-Estrella does plan to make the most of his time in BOP

---

[30] Nagin, *supra* note 13, at 5; NAT'L INST. OF JUST., *supra* note 12, at 1.

custody, engaging with programming and educational training, that does not merit extending his sentence beyond 120 months.

## CONCLUSION

Mr. Acosta-Estrella crimes were significant. But his personal circumstances, coupled with the difficulty of incarceration during the pandemic, have created a compounding effect – for lack of a better term – that make a sentence of 120 months imprisonment, "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3553(a)(2) and a just outcome which serves the interests of sentencing while not inadvertently creating greater hardships for Mr. Acosta-Estrella's family.

Respectfully Submitted
Defendant Carlos Acosta-Estrella
By his attorney,

/s/ Jessica Hedges
Jessica Hedges (BBO No. 645847)
Hedges & Tumposky, LLP
88 Broad Street, Suite 101
Boston, MA 02109
T) (617) 722-8220
F) (617) 507-8116

/s/ Joseph Krowski
Joseph Krowski Jr. (BBO no. 640902)
Law Office of Joseph F. Krowski
30 Cottage St.
Brockton, MA 02301
T)(508) 587-3701
F)(508) 588-6035

**CERTIFICATE OF SERVICE**

    I, Jessica Hedges, hereby certify that, on this the 26th day of June, 2023, I served one true and correct copy of the foregoing, where unable to do so electronically, by United States First-Class Mail, postage prepaid, to the Assistant United States Attorney of record in this matter.

                                            /s/ Jessica Hedges
                                            Jessica Hedges